## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOUISE RAFTER,<br>    3085 Ebano Drive,<br>    Walnut Creek, CA 94598<br><br>JOSEPHINE RATTIEN<br>and<br>STEPHEN RATTIEN,<br>    4101 Ingomar Street, N.W.<br>    Washington, D.C. 20015<br><br>and<br><br>PERSHING SQUARE CAPITAL<br>MANAGEMENT, L.P.,<br>    888 7th Avenue, 42nd Floor<br>    New York, New York 10019<br><br>        Plaintiffs,<br><br>v.<br><br>THE DEPARTMENT OF THE TREASURY,<br>    1500 Pennsylvania Avenue, N.W.<br>    Washington, D.C. 20220<br><br>THE FEDERAL HOUSING FINANCE AGENCY,<br>    Constitution Center<br>    400 7th Street, S.W.<br>    Washington, D.C. 20024<br><br>JACOB J. LEW, in his official capacity as<br>Secretary of the Treasury,<br>    1500 Pennsylvania Avenue, N.W.<br>    Washington, D.C. 20220<br><br>and<br><br>MELVIN L. WATT, in his official capacity as<br>Director of the Federal Housing Finance Agency,<br>    Constitution Center<br>    400 7th Street, S.W.<br>    Washington, D.C. 20024<br>        Defendants. | Civil Action No. 14-1404 |

## COMPLAINT

Plaintiffs Louise Rafter, Josephine Rattien, Stephen Rattien, and Pershing Square Capital Management, L.P. ("Pershing Square") (collectively, the "Plaintiffs"), by and through their undersigned attorneys, allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action to redress an unlawful and enormous governmental expropriation in connection with the conservatorships of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (individually, a "Company"; collectively, the "Companies").

2.      In 2012, the Federal Housing Finance Agency ("FHFA"), purportedly acting as the conservator of the Companies, and the Department of the Treasury ("Treasury") (collectively, the "Government") agreed between themselves to strip all profits from the Companies and to sweep those profits to Treasury every quarter, in perpetuity (the "Net Worth Sweep Agreements").

3.      That Government confiscation of the entire net worth of the Companies is specifically intended not just to reap a windfall for the Government but to deprive the Companies' common shareholders of any economic value in their shares.  Through the confiscation, Treasury and FHFA simultaneously seek to "expedite the wind down of Fannie Mae and Freddie Mac."

4.      The Government's brazen conduct in establishing the self-dealing Net Worth Sweep Agreements and requiring the ongoing quarterly sweeps (the "Net Worth Sweeps") is illegal.  It violates the Administrative Procedure Act and the statute that Congress constructed to govern conservatorship of the Companies.  It breaches FHFA's and Treasury's fiduciary duties to Plaintiffs, including by, in effect, converting Treasury's special class of preferred shares of the

Companies into a new super-senior form of preferred shares, for which the principal is never satisfied despite Treasury's receiving all residual value of the Companies—a right reserved to common shares.  Simultaneously, the Government's new regime prevents Plaintiffs, who are common shareholders, from participating in their rightful economic share of the Companies' distributions.  The Government's efforts to prevent Plaintiffs from pursuing any of their rights or powers as common shareholders, even as the Government illegally confiscates the economic value of their shares and liquidates the Companies, violates fundamental corporate law principles, including as established by state statute.

5.     The Housing and Economic Recovery Act of 2008 (the "Act" or "HERA") obligates FHFA as conservator to "put [a Company] in a sound and solvent condition," "carry on [its] business," and "preserve and conserve [its] assets and property."   HERA gives the conservator no authority to liquidate or wind down the Companies, much less to confiscate their entire net worth.

6.     Treasury and FHFA decided to take the Companies into conservatorship soon after the enactment of HERA in 2008.   HERA had granted Treasury temporary authority to purchase securities of each Company until the end of 2009.   Shortly after appointing itself conservator in September 2008, FHFA entered into a Senior Preferred Stock Purchase Agreement with Treasury with respect to each Company (the "Stock Purchase Agreements").   Those Stock Purchase Agreements allowed each Company to draw funds from Treasury in exchange for various interests and compensation, including a quarterly dividend at a fixed annual rate of 10% in cash or 12% in kind.   Those basic terms remained in place until Treasury and FHFA radically altered them, in effect creating an entirely new security, through the 2012 Net Worth Sweep Agreements.

7.      Congress chartered Fannie Mae and Freddie Mac to operate as privately owned, for-profit corporations.  Their stocks were widely held before conservatorship and remain so today.  Plaintiffs in this action include a retired nurse who has held common shares of Fannie Mae for approximately 25 years, and a retired psychiatric social worker and a retired scientist who have held common shares of Fannie Mae for approximately 15 years.

8.      HERA makes clear Congress's intent to "maintain [each Company's] status as a private shareholder-owned company."  12 U.S.C. §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v).  Under HERA, only in receivership—in contrast to conservatorship—can the rights of shareholders be "terminate[d]," *id*. § 4617(b)(2)(K)(i), and even then, the Act gives shareholders procedural protections, including the right to seek judicial review.  Indeed, upon taking the Companies into conservatorship and entering into the Stock Purchase Agreements with Treasury, then-FHFA Director James B. Lockhart publicly affirmed that, during conservatorship, the Companies' stock would remain outstanding and continue to trade, and *"[s]tockholders w[ould] continue to retain all rights in the stock's financial worth*" (emphasis added).  As then-Treasury Secretary Henry M. Paulson stated on September 7, 2008, "*conservatorship does not eliminate the common stock*" (emphasis added).

9.      The Companies' financial results had improved markedly by 2012.  By the end of the second quarter of 2012, both Companies were profitable, with the prospect of exceptionally large future profits.

10.      Treasury's authority to purchase securities of the Companies had expired *years earlier*, at the end of 2009.  But Treasury nevertheless devised the Net Worth Sweep Agreements with the intention of preventing the Companies' other shareholders from ever realizing any economic benefit from their shares, of seizing all of the Companies' profits for itself, and of furthering its long-held plan to liquidate the Companies.  It is no coincidence that Treasury and

FHFA executed the Net Worth Sweep Agreements just days after the Companies publicly disclosed their second quarter 2012 results showing strong profitability.

11.     Treasury has reaped an enormous windfall from the Net Worth Sweeps, having received a total of $218.5 billion.  As a result of the Net Worth Sweeps, from 2013 through September 2014, the Government will have expropriated approximately *$130.5 billion more* from the Companies than it was owed under the fixed 10% cash dividend option established in the Stock Purchase Agreements ($163.4 billion versus $32.9 billion).  As of September 2014, the Government will have stripped and swept approximately *$31 billion more* from the Companies than it had invested in them ($218.5 billion versus $187.5 billion).

12.     The Net Worth Sweeps have continued unabated:  every quarter, FHFA—purportedly acting as the Companies' conservator—directs each Company to pay its entire earnings to Treasury, in cash, without regard to any other shareholders.  The scale of the confiscation is vast:  the $31 billion that the Government has to date swept from the Companies above what it had invested in them equals 4.6% of the total U.S. federal budget deficit during fiscal year 2013.  The Congressional Budget Office estimated in February 2014 that the Net Worth Sweeps in 2014 alone will equal 0.5% of this year's U.S. gross domestic product.

13.     Moreover, under the terms of the self-dealing Net Worth Sweep Agreements, not only does Treasury receive the entire net worth of both Companies, but its liquidation preferences remain intact and undiminished.  (Treasury's liquidation preference for each Company comprises an initial $1 billion liquidation preference plus the amount of Treasury's capital infusions into each Company, totaling $187.5 billion.)  Thus, if and when FHFA is ultimately appointed receiver for the depleted Companies, Treasury having expropriated all of their profits, Treasury would still stand ahead of all other shareholders with a combined, undiminished liquidation preference of approximately *$189.5 billion*.

14.     The Government's Net Worth Sweeps do not just harm the Companies' other shareholders.    As further evidence of the Government's disregard for its statutory responsibilities, the Net Worth Sweeps eviscerate and imperil the Companies.  Freddie Mac has indicated that, "as a result of the net worth sweep dividend provisions of the senior preferred stock, [it does] not have the authority to build and retain capital from the earnings generated by [its] business operations and will not be able to build or retain any net worth surplus *or return capital to stockholders other than Treasury*" (emphasis added).  Fannie Mae has repeatedly warned that it will not be able to withstand any serious economic downturn because it cannot build or retain any capital as a result of the Net Worth Sweeps.  Rather than conserving the Companies' assets, Defendants are confiscating the entire net worth of the Companies and effectively liquidating them under the guise of conservatorship.

15.     Defendants' conduct is unlawful.  It violates FHFA's statutory authority and obligations as the conservator of each Company to preserve and conserve the assets of the Companies.  It constitutes an unauthorized purchase of what are in effect new securities years after Treasury's authority to do so expired.  It represents blatant self-dealing by the Government—which is both the Companies' conservator (FHFA) and their controlling shareholder (Treasury)—to strip and expropriate all profits from the Companies for the Government's sole benefit, to the detriment of Plaintiffs, and thus breaches Defendants' fiduciary duties to Plaintiffs.  The Net Worth Sweeps make Plaintiffs "shareholders" in name only, rather than the ultimate beneficiaries of the Companies' value that the law entitles them to be.  The Government's perpetual confiscations strip them of all economic value in their shares.

16.     To make matters worse, the Government has doubled down on its unlawful confiscation of the entire net worth of the Companies, by claiming that the shareholders have no right to the procedural protections that they would receive if the Government took the

Companies into receivership.  The only legal way under HERA for the Government to liquidate the Companies and terminate their shares is via receivership.  But Treasury and FHFA chose to take the Companies into conservatorship, and have no authority to flout the clear distinction that HERA draws between conservatorship and receivership.  Indeed, the Government's actions directly contradict its and the Companies' prior statements regarding conservatorship.  In September 2008, for example, FHFA publicly emphasized that "[u]nder a conservatorship, the Company is not liquidated. . . . The Conservator cannot make a determination to liquidate the Company. . . . Receivership is a statutory process for the liquidation of [the Company]."  FHFA even issued a final rule in 2011 with commentary explaining that "allowing capital distributions to deplete [a Company's] conservatorship assets would be inconsistent with the agency's statutory goals."  Both of the Companies have publicly stated that "unlike conservatorship, the purpose of which is to conserve [their] assets and return [them] to a sound and solvent condition, the purpose of receivership is to liquidate [their] assets and resolve claims against [them]."  The Government's assertion now that the shareholders and the courts have no power to stop its unlawful conduct is incorrect, contrary to its own public statements, and antithetical to the rule of law.

17.     Indeed, the Government maintains that Plaintiffs have no rights or powers whatsoever as common shareholders of the Companies, even while it confiscates all economic value of their shares and illegally winds down the Companies.  For example, FHFA summarily denied valid written demands by Pershing Square to the Companies' boards of directors for a books and records inspection, thus violating a fundamental right of common shareholders under state corporate law.  In doing so, FHFA asserted that Pershing Square, as a common shareholder of the Companies, had no rights or powers at all.  The Government is using the conservatorships, impermissibly, as a sword to expropriate for itself the Companies' entire net worth and wind

down the Companies, while simultaneously using them as a shield to attempt to foreclose Plaintiffs from pursuing any legal rights and powers as common shareholders.

18.     The Government's conduct also violates state fiduciary duty law by giving Treasury's special class of preferred stock rights that reside exclusively with the common shareholders.  Fundamental corporate law allows corporations to make cash payments in only a few ways:  meeting business expenses (*e.g.*, payments to suppliers, employees, and for taxes); paying interest and principal payments on debt; issuing dividends to preferred and common stockholders; and, finally, making distributions in liquidation.  Any other extraction of cash is contrary to law—in this case, an unlawful Government confiscation.  If the Government is claiming that it has not engaged in an illegal confiscation of the entire net worth of the Companies, then it has violated corporate law in another way:  it has granted itself super-senior preferred stock, unilaterally appropriating all rights of common shares to residual value and income generated by the Companies but without extinguishing or even reducing the principal of the previously issued senior preferred stock.  The holders of other senior securities (other outstanding preferred) and the common stock have thus suffered unique harm.  Plaintiffs bring a direct claim for breach of fiduciary duty to remedy the harm caused to them individually by the Government.

19.     This is an action to put an end to the Government's unlawful conduct.  Plaintiffs seek, and respectfully submit that they are entitled to, a declaratory judgment that the Net Worth Sweep Agreements and the Net Worth Sweeps pursuant to them are unlawful; injunctive relief barring Defendants' ongoing implementation of the Net Worth Sweeps; and rescission or other equitable and ancillary relief to undo the harm Defendants have done.

## JURISDICTION AND VENUE

20.    Counts I-IV of this action arise under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq.*, and HERA, Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §§ 1455, 1719, and 4617).  The Court has subject-matter jurisdiction over these claims under 28 U.S.C. § 1331.  The Court is authorized to issue the relief sought with respect to these claims pursuant to 5 U.S.C. §§ 702, 705, and 706.

21.    Counts V-VIII arise under Delaware and Virginia law.  The Court has subject-matter jurisdiction over these claims under 28 U.S.C. § 1367, as well as 12 U.S.C. §§ 1452(c), 1723a(a), and 4617(b)(2)(A).

22.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) and (B) because this is an action against officers and agencies of the United States and Defendants all reside in this judicial district; Treasury Secretary Jacob J. Lew and FHFA Director Melvin L. Watt both perform their official duties in this judicial district; and a substantial part of the acts or omissions giving rise to this action occurred in this judicial district.

## PARTIES

23.    Plaintiff Louise Rafter is a retired nurse who resides in California.  She owns 36,000 shares of Fannie Mae common stock, some of which she and her late husband purchased over 25 years ago and which she and/or her late husband have held continuously since then.  She brings claims as a common shareholder of Fannie Mae only; she does not bring claims with respect to Freddie Mac.

24.    Plaintiffs Josephine and Stephen Rattien are a married couple who reside in Washington, D.C.  Josephine Rattien is a retired psychiatric social worker and inner-city school counselor.  Stephen Rattien is a retired senior science and technology policy manager.  They jointly own 1,000 shares of Fannie Mae common stock, which they purchased approximately 15

years ago and which they have held continuously since then.  They bring claims as common shareholders of Fannie Mae only; they do not bring claims with respect to Freddie Mac.

25.     Plaintiff Pershing Square is a limited partnership duly organized and existing under the laws of Delaware, and its principal place of business is 888 7th Avenue, 42nd Floor, New York, New York 10019.  It is an investment advisor to private investment funds registered with the Securities and Exchange Commission under the Investment Advisor Act of 1940. Pershing Square primarily manages funds that are in the business of investing in securities. Pershing Square is the Companies' largest common shareholder, with an approximate 10% stake in the outstanding common stock of each Company.  It brings claims with respect to both Companies.

26.     Defendant Treasury is, and was at all relevant times, an executive agency of the United States, subject to the APA.  *See* 5 U.S.C. § 551(1).  Treasury is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

27.     Defendant FHFA is, and was at all relevant times, an independent regulatory agency of the United States, subject to the APA.  *See* 5 U.S.C. § 551(1).  FHFA was created on July 30, 2008, pursuant to HERA, and was appointed conservator of Fannie Mae and Freddie Mac by action of FHFA's Director on September 6, 2008.  FHFA is located at Constitution Center, 400 7th Street S.W., Washington, D.C. 20024.

28.     Defendant Jacob J. Lew is Secretary of the Treasury.  His official address is 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.  He is being sued in his official capacity. In this capacity, Secretary Lew has overall responsibility for Treasury's management and operation.  Secretary Lew, in his official capacity, is responsible for Treasury's conduct (including that which took place prior to his assuming that office) that is the subject of this Complaint and for the related acts and omissions alleged herein.

29.     Defendant Melvin L. Watt is the Director of FHFA.  His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.  He is being sued in his official capacity.  In this capacity, Director Watt has overall responsibility for the operation and management of FHFA, including responsibility for acting as conservator of the Companies. Director Watt, in his official capacity, is responsible for FHFA's conduct (including that which took place prior to his assuming that office) that is the subject of this Complaint and for the related acts and omissions alleged herein.

## FACTUAL ALLEGATIONS

### Fannie Mae and Freddie Mac

30.     Fannie Mae and Freddie Mac are congressionally chartered, private stockholder-owned corporations.  They perform the critical role of increasing liquidity, stability, and affordability in the mortgage market so that lenders can provide more homebuyers with long-term, low-cost financing.  They do so by, among other things, guaranteeing and purchasing mortgages and bundling these mortgages into mortgage-backed securities that are sold to investors.

31.     The Companies issued publicly traded securities, including common stock and numerous classes of non-cumulative preferred stock.  The common and preferred stock has been purchased by, among others, public pension funds; mutual funds; community banks; insurance companies; religious charities, including those dedicated to encouraging affordable housing; and individual investors, including Mrs. Rafter and Dr. and Mrs. Rattien.  The stock continues to trade.

32.     By 2008, the Companies were two of the largest financial institutions in the world—owning and guaranteeing trillions of dollars of assets.  Prior to 2008, they regularly declared and paid dividends to their shareholders, and were generally considered a low-risk

investment, including for individual investors such as Mrs. Rafter and Dr. and Mrs. Rattien. Fannie Mae had not reported a full-year loss since 1985, and Freddie Mac had not since 1989.

### The Housing Crisis and HERA

33.     Beginning in late 2006, the housing market suffered a substantial decline in value, leading to an increasing number of delinquent and defaulted mortgages.   As a result, Fannie Mae's and Freddie Mac's guarantee and investment portfolios decreased in value.   Both Companies experienced net losses beginning in 2007.   However, those losses were largely due to credit provisions—which represent *estimates* of future credit losses—that ultimately proved excessive.   Actual credit losses from 2007 to 2011 were approximately $140 billion less than anticipated.   A significant portion of the losses recorded in that period related to the write-down of deferred tax assets, which the Companies would be able to reverse when they returned to profitability.   Because of these adjustments, the Companies had less operating cash available.

34.     As the housing and financial crisis deepened, Congress enacted HERA in July 2008.   That Act created FHFA and consolidated regulation of the Companies under it.   12 U.S.C. § 4511.

35.     As relevant here, the Act has two major features.   First, it provided Treasury temporary authority to purchase "obligations and other securities" of each Company.   12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A).   The Act authorized these purchases only upon specified findings by the Secretary of the Treasury.   The Secretary was required to consider enumerated factors, including the "need to maintain [each Company's] status as a private shareholder-owned company." *Id.* §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v).   Importantly, the Act clearly provides that Treasury's emergency purchase authority expired on December 31, 2009.

36.     Second, the Act authorizes FHFA to place the Companies into either conservatorship or receivership in certain circumstances.   The statute carefully distinguishes

between FHFA's powers as a conservator and as a receiver. In a section describing general powers applicable to either, the Act authorizes FHFA to do a variety of things, including "preserv[ing] and conserv[ing] the assets" of the Companies, but not liquidating them or winding them down. *Id*. § 4617(b).

37.     HERA then specifically delineates FHFA's additional "Powers as conservator." Those include taking such action as may be necessary to "put the [Company] in a sound and solvent condition," "carry on" its business, and "preserve and conserve" its "assets and property." *Id*. § 4617(b)(2)(D)(i) and (ii). These powers of the conservator do not confer any authority to extract all profits from, liquidate, or wind down the Companies, which would be antithetical to the purpose of a conservator.

38.     Only in the next section, titled "*Additional* powers *as receiver*," does the Act authorize—indeed, require—FHFA to liquidate a Company. *Id*. § 4617(b)(2)(E) (emphasis added). Under the Act, receivership terminates any existing conservatorship and triggers an immediate right to judicial review. It also mandates numerous other special procedures, including a detailed process for the receiver to determine claims against a Company, which again incorporates an express right to judicial review.

39.     The Act additionally specifies that, as either conservator or receiver, FHFA "shall not be subject to the direction or supervision of any other agency of the United States . . . in the exercise of [its] rights, powers, and privileges . . . ." *Id*. § 4617(a)(7).

**FHFA Becomes the Companies' Conservator**

40.     In July 2008, James Lockhart, Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") and soon thereafter Director of FHFA, made clear in a public statement that the Companies were "adequately capitalized, holding capital well in excess of [regulatory requirements]" and had "large liquidity portfolios, access to the debt market and over

13

$1.5 trillion in unpledged assets."   Testifying before Congress that same day, both Henry Paulson, then-Treasury Secretary, and Benjamin Bernanke, then-Chairman of the Federal Reserve, echoed the OFHEO Director's statements that each Company was "adequately capitalized," which meant that the Company met or exceeded all of its risk-based, minimum, and leverage capital requirements.   In letters to each Company dated August 22, 2008, FHFA found that each Company met all relevant capital requirements, including additional capital requirements imposed by FHFA above the statutory minimums and the requirements arising from FHFA's risk-based capital stress test.

41.   Just two weeks later, Treasury and FHFA sought the consent of the Companies' boards of directors to place the Companies in conservatorship.   FHFA Director Lockhart explained in September 2008 that "the goal of these dual conservatorship actions is to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and reduce the systemic risk that would have exacerbated the instability in the current market."   Upon information and belief, the conservatorship and the accompanying injection of capital benefited the Government's broader purpose by avoiding the need for the Companies to scale back their mortgage market activities or sell mortgage-backed assets in order to improve their capital ratios.

42.   Confidence in the solvency of the Companies was critical to the financial system; they guaranteed approximately $3.6 trillion of mortgage-backed securities and had issued approximately $1.7 trillion in debt held primarily by financial institutions.   Diminished confidence could have affected the valuation of these assets and the solvency of other financial institutions.   Diminished confidence in the Companies' guarantees could also have adversely affected investment in mortgage assets and the rates required for mortgage loans.

43.     By choosing a conservatorship to achieve these goals, FHFA committed to specific statutory duties and limitations as conservator, which prevented it from liquidating the Companies or gutting their assets and property.  Upon information and belief, FHFA obtained the consent of the Companies' boards of directors to conservatorship in part on the ground that conservatorship would serve the interests of their shareholders.  Conservatorship, unlike receivership, does not "terminate" the rights of shareholders.  *Id*. § 4617(b)(2)(K)(i).  Upon information and belief, in exchange for FHFA's promise, the Companies' boards of directors agreed not to challenge FHFA's appointment as conservator.

### Treasury's Preferred Stock

44.     The day after the Director of FHFA appointed FHFA as conservator of the Companies, Treasury exercised its emergency authority to purchase securities of the Companies.  Treasury entered into the Stock Purchase Agreements with FHFA in the latter's capacity as conservator of the Companies.  In authorizing the preferred stock purchases, the Secretary of the Treasury certified that, as the statute requires, he considered "[t]he need to maintain the [Companies'] status as [] private shareholder-owned compan[ies]."

45.     For each Company, Treasury agreed to provide up to $100 billion (later amended to $200 billion) from which each Company could draw, in exchange for a special class of Treasury senior preferred shares.  In each case, the Stock Purchase Agreement entitled Treasury to (1) a first-priority liquidation preference, equal to $1 billion plus the total amount of Treasury's capital infusion to the Company; (2) a dividend payable quarterly either in cash (fixed at an annual rate of 10% of the liquidation preference) or in stock (fixed at an annual rate of 12%); (3) a "Periodic Commitment Fee," scheduled to commence in 2010 but never ultimately imposed; and (4) warrants to purchase 79.9% of the Company's common stock for a nominal price.

46.     The warrants provided Treasury with a mechanism to achieve a significant benefit if the Companies returned to profitability.  Treasury at the time recognized that the warrants would "provide potential future upside to the taxpayers," while the existing common shareholders would continue to hold the rights to the value of their shares.

47.     The Stock Purchase Agreements also included provisions that strengthened Treasury's direct control over each conservatorship.  Among other things, they forbade FHFA, without Treasury's consent, to (1) authorize the Companies to pay any dividend or to make any other distribution on any existing equity interest other than to the Treasury senior preferred stock; (2) dispose of any assets other than for fair market value; or (3) hold debt or mortgage assets in excess of specified amounts.  The Stock Purchase Agreements even prohibit FHFA, without Treasury's consent, from exercising its authority under HERA to end the conservatorships or to appoint a receiver.

48.     However, Treasury has unlawfully exercised its direct control over the conservatorships to place the general interest of taxpayers—beyond the interest in repayment of draws and dividends—ahead of the interests of all of the Companies' other shareholders and to preclude FHFA as conservator from preserving the value of the Companies for any shareholders other than Treasury.  For example, the Companies proposed to sell to third-party investors their investments in low-income housing tax credits in order to derive value from these assets. Treasury withheld its approval for the sale.  It "stated the proposed sale would result in a loss of aggregate tax revenues that would be greater than the savings to the federal government from a reduction in the capital contribution obligation of Treasury" to the Companies under the Stock Purchase Agreements.  The result was that the Companies could not sell or transfer the assets, which worked solely to the benefit of their controlling shareholder, Treasury.

49.     Treasury's emergency authority to "purchase any obligations and other securities issued by" the Companies expired on December 31, 2009.   12 U.S.C. §§ 1455(l), 1719(g). Recognizing that this deadline "constrained" Treasury's "ability to make further changes to the [Stock Purchase Agreements]," Treasury officials on December 22, 2009, proposed certain changes before the authority expired.   They wrote to then-Treasury Secretary Timothy Geithner that the Companies "have moved from being a source of instability during the early stages of the crisis to a stable and critical source of mortgage financing to the market today" and that Fannie Mae and Freddie Mac had only drawn $60 billion and $51 billion, respectively, of the $200 billion available to each.   The officials nevertheless proposed changes to the Stock Purchase Agreements (changes that ultimately were adopted) to replace the fixed $200 billion cap with a formulaic cap to provide for scenarios that might arise after Treasury's purchase authority had expired.   That amendment (the Second Amendment to the amended and restated Stock Purchase Agreements), signed days before the expiration of Treasury's emergency authority in December 2009, did not change the rights of the Companies' other shareholders.

### FHFA's Duties as Conservator

50.     After the Director of FHFA appointed FHFA as conservator of each Company and executed the Stock Purchase Agreements in exchange for Treasury's support, FHFA acknowledged that the conservatorships were intended to stabilize and restore the Companies and to conserve and preserve their assets.   FHFA Director Lockhart issued a statement on September 7, 2008, explaining that conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations." He emphasized that "FHFA will act as the conservator to operate the [Companies] until they are stabilized."   Once its "plan to restore the Compan[ies] to a safe and solvent condition has been

completed successfully," FHFA promised in a September 7, 2008 fact sheet, "the Director will issue an order terminating the conservatorship."

51.     FHFA emphasized in its fact sheet that "[u]nder a conservatorship, the Company is not liquidated. . . . The Conservator cannot make a determination to liquidate the Company. . . . Receivership is a statutory process for the liquidation of [the Company]."  Both Companies have consistently made this distinction in their public disclosures.

52.     In September 2008, FHFA publicly underscored that, during conservatorship, the Companies' stock would remain outstanding, that it would continue to trade, and that *"[s]tockholders will continue to retain all rights in the stock's financial worth*" (emphasis added).  Similarly, Treasury Secretary Paulson told the public on September 7, 2008 that "conservatorship does not eliminate the common stock."  Indeed, the Stock Purchase Agreements make clear that even upon voluntary or involuntary liquidation or winding up of a Company, preferred and then common stockholders are entitled to receive payment or distribution of the remaining net value of the Companies.  Both HERA and FHFA's regulation on conservatorship and receivership provide the same priority.

53.     Director Lockhart reaffirmed in testimony to Congress on September 25, 2008, that conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of maintaining normal business operations and restoring its safety and soundness," and that FHFA would act as conservator only "until the [Companies] are stabilized."

54.     In congressional testimony in June 2009, Director Lockhart emphasized that "[a]s the conservator, FHFA's most important goal is to *preserve the assets of Fannie Mae and Freddie Mac over the conservatorship period.  That is our statutory responsibility*" (emphasis added).

55.     In a "Strategic Plan 2009-2014" document issued in July 2009, FHFA included the following "strategic goal": "The conservatorship of Fannie Mae and Freddie Mac allows the FHFA to preserve the assets of the [Companies], ensure they focus on their housing mission and are positioned to emerge from conservatorship as financially strong."  It again emphasized that the conservatorship was "designed to stabilize troubled institutions with the objective of maintaining normal business operations and restoring financial safety and soundness."

56.     Throughout 2010 and 2011, FHFA continued to reaffirm publicly its goal of returning the Companies to normal business operations.  In February 2010, FHFA's new Acting Director, Edward J. DeMarco, told Senate and House leaders that "FHFA is focused on conserving the [Companies'] assets" and "put[ting] [them] in a safe and solvent condition."  In a report to Congress in June 2011, FHFA touted its goals of "preserv[ing] and conserv[ing] each [Company]'s assets and property and restor[ing] the [Companies] to a sound financial condition so they could continue to fulfill their statutory mission of promoting liquidity and efficiency in the nation's housing finance markets."

57.     In June 2011, FHFA issued a final rule interpreting and implementing HERA's conservatorship and receivership provisions.  FHFA's interpretation acknowledged the statutory and common-sense distinction between the powers of a conservator and those of a receiver and the limitations imposed by the statute on FHFA's authority as conservator.  The rule underscored that, under the statute, "[a] conservator's goal is to continue the operations of a [Company], rehabilitate it and return it to a safe, sound and solvent condition."  In contrast, "[t]he ultimate responsibility of FHFA as receiver is to resolve and liquidate the [Company]."  The rule sets forth the priority of claims to which current or former shareholders would be entitled in a receivership.

58.     In explaining its new rules, FHFA emphasized that capital distributions conflicted with its statutory obligations as conservator:

> As one of the primary objectives of conservatorship of a [Company] would be restoring that [Company] to a sound and solvent condition, allowing capital distributions to deplete the [Company's] conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the [Company].

59.     Several months later, in November 2011, Acting Director DeMarco told the Senate:  "By law, the conservatorships are intended to rehabilitate the [Companies] as private firms."

**Treasury Implements Its Plan**

60.     Upon information and belief, while FHFA made those statements to the public and to Congress, Defendants quietly developed a different plan.

61.     An internal memorandum to Treasury Secretary Geithner from Under Secretary of the Treasury for Domestic Finance Jeffrey Goldstein, dated December 20, 2010, referred to a "commitment" by the Administration to "*ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future*" (emphasis added).

62.     In that memorandum, Treasury considered doing so by setting the Periodic Commitment Fee—which the Stock Purchase Agreements required to be set "with reference to the market value of the Commitment"—instead "equal to any generated positive net income (subject to further legal review)."  Upon information and belief, Treasury abandoned the idea of a net worth sweep through the Periodic Commitment Fee because its legal review determined that doing so would violate the terms of the Stock Purchase Agreements, which required the fee to be set "with reference to the market value" of the commitment.

63.     In February 2011, Treasury issued a white paper expressing its intention to "us[e] a combination of policy levers to wind down Fannie Mae and Freddie Mac." It stated that "[t]he Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae and Freddie Mac's role in the market and ultimately wind down both institutions." Treasury's plan to wind down the Companies—a process that would start "now," Geithner said—was contrary to the statutory limits on FHFA's authority as conservator, the statutory prohibition on any other government agency directing or supervising FHFA, and FHFA's previous public statements regarding its duties as conservator.

64.     Treasury had and exercised actual control over FHFA's conduct as conservator through pressure and influence, as well as through the terms of the Stock Purchase Agreements. It continues to exercise that control today. Thus, FHFA is not independent of Treasury under applicable state corporation law and is acting at Treasury's direction, contrary to the prohibition in HERA.

65.     In 2012, FHFA did an about-face from its prior public statements acknowledging its statutory obligation to preserve and conserve the Companies' assets and property and to return the Companies to normal operations. Alluding to FHFA's previously expressed "understanding of its conservatorship obligations and how it planned to fulfill those obligations," Acting Director DeMarco told Congress on February 21, 2012 that "[i]t is time to update and expand that plan." He acknowledged that the change was consistent with "the white paper produced last year by Treasury." FHFA's new strategic plan recast its responsibilities and authority under HERA. Contrary to its previously stated conservatorship approach, FHFA declared that, with "taxpayers providing the capital supporting [Company] operations, [the statutory] 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers." For the first time,

FHFA suggested that its conservatorship powers allowed it to undertake "an orderly disposition of a firm."

66.     By 2012, it was clear that the Companies were returning to strong profitability. Freddie Mac had reported profits for the fourth quarter of 2011.  The Companies released their results for the first quarter of 2012 in early May.  Both reported profits.  Fannie Mae reported "significant improvement" in its financial results and an expectation that its financial results for 2012 would be "significantly better" than its 2011 results.

67.     The Companies released their results for the second quarter of 2012 on August 7 and 8.  Both Companies again reported profits, in each case substantially greater than in the first quarter.  Fannie Mae again reported "significant improvement" in its results and a continued expectation of significantly better results for 2012.  It noted "improvement in the housing market in the first half of 2012."  Freddie Mac also noted stabilization in the housing market.

68.     By August 2012, neither Company was drawing anything on its commitment from Treasury, even to pay the substantial fixed dividends to which Treasury was entitled under the Stock Purchase Agreements.

69.     Before Treasury and FHFA entered into the Net Worth Sweep Agreements in August 2012, it was or should have been evident to them that the residential housing market was recovering and that the Companies had returned to strong profitability.

70.     It also was or should have been evident to FHFA and Treasury that, if the housing recovery continued, accounting principles would require the Companies to greatly increase the value of their assets and decrease their multi-billion-dollar loss reserves, thus recapturing most of the value lost in the preceding years.  Both Companies had stated as much in their results.  Given that both Companies had returned to profitability, Treasury and FHFA were also well aware that

they would ultimately benefit from the write-up of more than $70 billion of deferred tax assets that the Companies would be able to utilize going forward.

71.     Internal Treasury documents created before the Net Worth Sweep Agreements show that the decision to enter into those Agreements reflected the Government's policy decision to wind down the Companies—a policy that FHFA as conservator did not have authority to pursue and which conflicted with the interests of all of the Companies' shareholders other than Treasury.  By their terms, those documents also make clear that it was Treasury that planned, in whole or in major part, what became the Net Worth Sweep Agreements and the ensuing Net Worth Sweeps.

72.     To justify the Net Worth Sweep Agreements, Treasury prepared an analysis showing that the Companies would be unable to pay the 10% dividend on amounts outstanding "*due to the enterprises being wound down*" (emphasis in original).  This analysis projected that, starting in 2014, because of the Government's decision to wind down the Companies (an action unauthorized and contrary to conservatorship), their profits would be inadequate to pay the 10% dividend to Treasury, requiring them to draw down more funds from Treasury.  The analysis ignored the 12% stock dividend option.

73.     Treasury based its analysis on financial projections that were outdated and, by early August 2012, were being proven too pessimistic and far off base, given the already apparent turn in the housing market and the substantial profits being realized by the Companies. For instance, the analysis projected as the "base case" that the Companies would together lose $6.4 billion in 2012.  Yet Fannie Mae had already reported net income of $7.8 billion for just the first two quarters in 2012 and expectations of positive net worth for the year, and Freddie Mac had reported net income of over $3.5 billion for the same time period.  The Companies together earned a profit of over $28 billion in 2012.

74.     Internal Treasury documents make clear that a principal purpose of the Net Worth Sweep Agreements was to "[r]eplace the current fixed 10% dividend with a 'net worth sweep' dividend," which would "result in Treasury *receiving all future income generated by the [Companies]*" (emphasis in original).

**The Net Worth Sweep Agreements
and Their Effect on Shareholders Other Than Treasury**

75.     On August 17, 2012, Treasury and FHFA—without regard for the expiration of Treasury's purchase authority more than two years earlier—signed the Net Worth Sweep Agreements (as a Third Amendment to the Stock Purchase Agreements).  The Net Worth Sweep Agreements suspended the market-based Periodic Commitment Fee for as long as they remain in effect and replaced the Stock Purchase Agreements' prior fixed dividend options with the perpetual quarterly Net Worth Sweeps, which pay Treasury, in cash, the difference between each Company's assets and liabilities (plus a small specified capital reserve that continually diminishes until it reaches zero by 2018).

76.     That plan has the effect of fulfilling Treasury's years-old policy of "ensur[ing]" that "existing common equity holders will not have access to any positive earnings from the [Companies] in the future."  The Net Worth Sweep Agreements and the Net Worth Sweeps, implemented each quarter during conservatorship, deprive common shareholders of access to any of the value of the Companies' positive earnings, now or in the future, without affording any of the procedural protections such shareholders would have in a receivership.  Under express terms of the Net Worth Sweep Agreements, unless Treasury voluntarily chooses to waive its rights, every shareholder other than Treasury can never receive any value from the Companies, whether through dividends or liquidating distributions, regardless of how profitable the Companies may become.  Every penny of net value is swept exclusively to Treasury.

77.     For Treasury, the Net Worth Sweeps have the benefit of providing significant off-budget revenue without politically unpalatable tax increases or spending cuts.

78.     After announcing the Net Worth Sweep Agreements, FHFA made vague and convoluted attempts to reconcile them with its prior position regarding the objectives of conservatorship and its own statutory duties and limitations.

79.     Treasury did not even attempt to hide its intent.   In a press statement titled "Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac," Treasury acknowledged that it designed the Net Worth Sweep Agreements to "make sure that every dollar of earnings each firm generates" goes to the Government and to "help expedite the wind down of Fannie Mae and Freddie Mac."

80.     Flouting HERA's requirements for, and limits on, conservatorship, Treasury stated that the Companies "*will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form*" (emphasis added).   Contrary to FHFA's statutory and fiduciary responsibilities to preserve and conserve the assets and property of each Company, FHFA stated, "[t]his change also ensures all the [Companies'] earnings are used to benefit taxpayers."

81.     Treasury directed and continues to direct FHFA to implement the Net Worth Sweeps, notwithstanding HERA's proscription that FHFA as conservator "shall not be subject to the direction or supervision of any other agency of the United States . . . ."   12 U.S.C. § 4617(a)(7).   FHFA Acting Director DeMarco admitted as much in March 2013.   He stated that "[t]he Administration has made clear that their preferred course of action is to wind down the [Companies]" and that the Net Worth Sweeps reinforce that "the [Companies] will *not* be building capital as a potential step to regaining their former corporate status."   In August 2013, the Administration issued a fact sheet on housing priorities, stating that confirming Watt as

FHFA director "will provide certainty and leadership at FHFA while it plays a critical role in winding down Fannie Mae and Freddie Mac."  Moreover, the Stock Purchase Agreements themselves cede key decisions to Treasury, such as whether and when to terminate the conservatorship.

82.    The Government's plans for the Companies are not in doubt.  In a January 2014 speech, the Treasury Secretary's Counselor for Housing Finance Policy, Michael Stegman, characterized the FHFA Director's "broad responsibilit[y]" as "wind[ing] down the [Companies]."  In addressing questions about the private label securities mortgage market in June 2014, Stegman again referred to "winding down the [Companies]."  Testifying before Congress in March 2014, Secretary Lew stated that Treasury "ha[s] had a very clear policy on Fannie and Freddie, which is that we're winding them down."  Likewise, the 2013 and 2014 annual reports of the Financial Stability Oversight Council—over which Secretary Lew presides as Chairman and whose voting members include all significant administrative bodies on U.S. financial policy—express Treasury and FHFA's shared intent to "wind-down" the Companies. A speech on June 13, 2014 by Mary Miller, the Under Secretary of the Treasury for Domestic Finance, and FHFA's annual report to Congress, released the same day, reinforce that position.

83.    FHFA continues to take actions to dismantle the Companies by requiring changes to their business operations, including contracting their presence in the mortgage market, that have adverse effects on their financial results and result in winding them down rather than restoring them to a sound and solvent condition.

84.    Moreover, Defendants have made clear that they are acting without regard for preserving and conserving the Companies' assets and property or for the interests and rights of any of the Companies' shareholders other than the Government.  In remarks in May 2014, for example, FHFA Director Watt stated:  "I don't lay awake at night worrying about what's fair to

the shareholders."  How the shareholders other than the Government have been and continue to be treated pursuant to the Net Worth Sweep Agreements was "just not [his] responsibility."  Watt added that he did not create the arrangement, and that "it's not [his] job to worry about whether it's fair or not fair."  That indifference would not change in the future:  "I just don't have time to think about what might happen in the future with the shareholders."

85.    Preserving the Net Worth Sweeps underscores Treasury's role in controlling major decisions regarding the Companies' conservatorships, and leaves Defendants in violation of their statutory mandate and restrictions.  In adopting the Net Worth Sweep Agreements and requiring the ensuing Net Worth Sweeps, Treasury ignored and continues to ignore its obligation to consider "[t]he need to maintain" the Companies' "status as . . . private shareholder-owned" companies, as required by HERA, 12 U.S.C. §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v).  For its part, FHFA is flouting its obligations as conservator to preserve and conserve the Companies' assets and property for the benefit of the Companies and all of their shareholders, and to put the Companies in a sound and solvent condition.

### The Net Worth Sweeps Imperil the Companies

86.    In adopting the Net Worth Sweep Agreements and in requiring the ongoing Net Worth Sweeps, FHFA is acting in direct violation of its statutory duties as conservator of the Companies to put each Company in a sound and solvent condition.  It is violating its own previous public commitments to use conservatorship to "enhance [the Companies'] capacity to fulfill their mission" and "ensure" they "are positioned to emerge from conservatorship as financially strong."  Fannie Mae has repeatedly warned that, as a direct result of the Net Worth Sweeps, it is unable to withstand a serious downturn of the kind that occurred in 2006-2008.  In April 2014, for example, the Companies underwent a stress test pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act.  Under one of the scenarios of the stress test, the

"severely adverse" scenario created by FHFA, the result was that Fannie Mae would require a capital infusion from Treasury of between $34 billion and $98 billion.  Fannie Mae stated that under the Net Worth Sweep Agreements, its "ability to accumulate capital is severely restricted and the [C]ompany is required to reduce its capital on a yearly basis."  "The results of the severely adverse scenario are not surprising," the Company noted, given its "limited capital." The Company emphasized:  "Under the terms of the [Net Worth Sweep Agreements], Fannie Mae is not permitted to retain capital to withstand a sudden, unexpected economic shock of the magnitude required by the stress test."

87.    In adopting and implementing the Net Worth Sweep Agreements, FHFA is also ignoring its express obligations with respect to the Companies' capital requirements and limitations on capital distributions.  By statute, FHFA must classify each Company's capitalization on at least a quarterly basis.  Capitalization is rated on a four-step scale from "adequately capitalized"—the highest rating—to "undercapitalized," "significantly undercapitalized," and finally "critically undercapitalized," the lowest rating.  A Company's classification is based on objective measures of capital, although FHFA has discretionary authority to downgrade a Company one level based on unsafe and unsound practices and other factors unrelated to capital levels.  In its last classification before imposing conservatorship, FHFA classified each Company as "adequately capitalized."  Barely two months later, it imposed conservatorship on each Company.  Within a month thereafter, FHFA suspended indefinitely its statutory obligation to classify the Companies' capitalization.  It has no authority to suspend that requirement.

88.    Neither Company may make capital distributions that would reduce its level of capitalization except in specified circumstances.  By simply "suspending" the requirement that it classify the Companies' capitalization, FHFA sought unlawfully to avoid the effect of these

restrictions.   The Net Worth Sweeps leave the Companies with minimal capital reserves each quarter, declining to zero by 2018.   By the Companies' own admission, despite their recent, sustained profitability, this meager cushion leaves them perpetually vulnerable and unable to withstand any significant economic shock or downturn.   Upon information and belief, under the statutory capital classification system, each of the Companies would be classified as "critically undercapitalized" due to the effect of the Net Worth Sweeps.

89.     FHFA thus has not only ignored its statutory duties as conservator, but has abdicated its responsibilities as a regulator as well.   Failing to return the Companies to "safe and sound" condition not only deprives existing shareholders of the economic value of their shares, it puts the Companies and the economy as a whole at unnecessary risk.

**FHFA Denies Any Rights or Powers of Plaintiffs as Shareholders**

90.     In letters dated July 9, 2014, Plaintiff Pershing Square sent a written notice to each Company's board of directors of a demand to permit Pershing Square to inspect and make copies of the Company's stockholder list.   Each letter specified a date and time for the inspection, described Pershing Square's shareholdings, stated the legal authority for making the demand, set out a proper purpose for the demand, and otherwise complied with all applicable requirements—including the Companies' bylaws—and made a valid demand.

91.     In a response dated July 17, 2014, FHFA summarily rejected the demands. Rather than challenge the purpose or timing of the demands, it asserted that Pershing Square had no rights or powers at all as a shareholder of the Companies during the conservatorships.   FHFA did so notwithstanding that the Government, under the guise of the conservatorships, is (1) winding down the Companies, and (2) expropriating the entire net worth of the Companies pursuant to securities effectively purchased by Treasury after its authority to do so had expired, all of which violates HERA and the Government's prior public statements of its duties under

HERA.  The only legal way the Government may wind down the Companies or terminate the Companies' shares under HERA is through receivership—which, in that extreme event, gives to common shareholders specific procedural protections, including the right to judicial review.  The Government seeks to use the conservatorships both for its own legally impermissible ends and to prevent the Companies' other shareholders from seeking to protect or pursue any shareholder rights or powers, including those as fundamental as the right to inspect stockholder lists.

### Treasury's Ill-Gotten Gains

92.    Had the Net Worth Sweeps not been implemented and had the Companies paid a cash dividend to Treasury, the prior, 10% fixed dividend would have resulted in quarterly payments from Fannie Mae and Freddie Mac to Treasury since January 1, 2013, approximately as follows:

|                | Fannie Mae    | Freddie Mac   | Combined Total |
|----------------|---------------|---------------|----------------|
| March 2013     | $2.9 billion  | $1.8 billion  | $4.7 billion   |
| June 2013      | $2.9 billion  | $1.8 billion  | $4.7 billion   |
| September 2013 | $2.9 billion  | $1.8 billion  | $4.7 billion   |
| December 2013  | $2.9 billion  | $1.8 billion  | $4.7 billion   |
| March 2014     | $2.9 billion  | $1.8 billion  | $4.7 billion   |
| June 2014      | $2.9 billion  | $1.8 billion  | $4.7 billion   |
| September 2014 | $2.9 billion  | $1.8 billion  | $4.7 billion   |
| Total          | $20.3 billion | $12.6 billion | $32.9 billion  |

93.    Since January 1, 2013, pursuant to the Net Worth Sweep Agreements, FHFA as conservator has directed each Company's board of directors to declare a cash dividend to Treasury each quarter in the amount of the Company's entire earnings or positive changes in net worth, whether from cash income or non-cash accounting entries modifying loss reserves or deferred tax assets.

94.    In 2013, Fannie Mae and Freddie Mac had record profits.  But because of the Net Worth Sweeps, every dollar of that profit went to Treasury.

95.     To date, the Government has stripped from the Companies and swept to Treasury the following amounts under the Net Worth Sweeps:

|  | Fannie Mae | Freddie Mac | Combined Total |
|---|---|---|---|
| March 2013 | $4.2 billion | $5.8 billion | $10 billion |
| June 2013 | $59.4 billion | $7.0 billion | $66.4 billion |
| September 2013 | $10.2 billion | $4.4 billion | $14.6 billion |
| December 2013 | $8.6 billion | $30.4 billion | $39.0 billion |
| March 2014 | $7.2 billion | $10.4 billion | $17.6 billion |
| June 2014 | $5.7 billion | $4.5 billion | $10.2 billion |
| September 2014 | $3.7 billion | $1.9 billion | $5.6 billion |
| **Total** | **$99 billion** | **$63.9 billion** | **$ 163.4 billion** |

96.     In its Budget Analysis for fiscal year 2015, the Office of Management and Budget estimated that the cumulative budgetary impact of the Stock Purchase Agreements, as amended by the Net Worth Sweep Agreements, from 2008 through fiscal year 2024 will be a net gain to Treasury of over $179 billion, nearly the amount it invested in the Companies, while leaving its principal undiminished *and* retaining a separate right to buy nearly 80% of the Companies' equity for a nominal amount.

97.     Upon information and belief, FHFA will continue to direct the Companies' boards of directors to make those windfall dividend payments each quarter, indefinitely.

98.     The Net Worth Sweeps deprive the Companies' shareholders other than Treasury of the economic value of their shares.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Administrative Procedure Act:**
**Exceeding Statutory Authority**
**(Against FHFA and Director Watt)**

99.     Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

100.    The APA provides that "a reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D).  FHFA and Director Watt have acted in excess of statutory authority and in contravention of unambiguous statutory limits.

101.    FHFA's statutory authority as conservator is restricted to "such action as may be necessary to put [a Company] in a sound and solvent condition" and "appropriate to carry on the business of the [Company] and preserve and conserve the assets and property of the [Company]." 12 U.S.C. § 4617(b)(2)(D).  FHFA as conservator does not have authority to wind down or liquidate the Companies, nor to confiscate for Treasury all of the Companies' net worth.

102.    The Net Worth Sweep Agreements, and the ensuing Net Worth Sweeps, exceed FHFA's authority as conservator.  They are not designed to put the Companies in a sound and solvent condition and will not preserve and conserve the assets and property of Fannie Mae and Freddie Mac.  To the contrary, FHFA has acknowledged that such capital distributions undermine the statutory goals of conservatorship, including by stripping out the Companies' capital.  Treasury has admitted that the intent of the Net Worth Sweeps is to expedite the winding down of Fannie Mae and Freddie Mac, not to restore them to a sound and solvent condition. That course of conduct exceeds the statutory authority set out in 12 U.S.C. § 4617(b)(2)(D).

103.    HERA also bars FHFA as conservator from acting under the "direction or supervision of any other agency of the United States . . . ." 12 U.S.C. § 4617(a)(7).

104.    In adopting the Net Worth Sweep Agreements and directing Fannie Mae and Freddie Mac to pay the Net Worth Sweeps, FHFA acted at the direction of Treasury.  That conduct therefore violates the statutory limit set out in 12 U.S.C. § 4617(a)(7).

105.    Accordingly, FHFA's and Director Watt's conduct is in excess of their statutory authority, and Plaintiffs are entitled to relief under 5 U.S.C. §§ 702, 706(2)(C), (D).

**COUNT II**
**Violation of the Administrative Procedure Act:**
**Exceeding Statutory Authority**
**(Against Treasury and Secretary Lew)**

106.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

107.    The APA provides that "a reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D).  Treasury and Secretary Lew have acted in excess of their statutory authority.

108.    HERA gave Treasury "temporary authority . . . to purchase obligations and securities" from each Company on "such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine."   12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A).   To exercise that authority, Treasury was required to consider "[t]he need to maintain the [Company's] status as a private shareholder-owned company."   12 U.S.C. §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v).  And that statutory authority expressly expired on December 31, 2009.  12 U.S.C. §§ 1455(l)(4), 1719(g)(4).

109.   On August 17, 2012, Treasury entered into a purported "modification" of its existing preferred shares through the Net Worth Sweep Agreements, called the Third Amendments to the Stock Purchase Agreements.   Among other things, the Net Worth Sweep Agreements replaced a right to a fixed 10% dividend with an unlimited right to receive all of Fannie Mae's and Freddie Mac's earnings, to the exclusion of all other shareholders, in perpetuity, and without satisfying any part of the preferred shares' liquidation preference.   That action so altered the rights of the stock as to constitute the purchase of a new security, which Treasury had no authority to make at that time and with respect to which Treasury made none of the prerequisite factual findings that HERA requires.

110.   Accordingly, Treasury's and Secretary Lew's actions effecting and pursuant to the Net Worth Sweep Agreements are in excess of their statutory authority, and Plaintiffs are entitled to relief under 5 U.S.C. §§ 702, 706(2)(C), (D).

**COUNT III**
**Violation of the Administrative Procedure Act:**
**Arbitrary and Capricious Conduct**
**(Against FHFA and Director Watt)**

111.   Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

112.   The APA provides that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).   Under this standard, an agency must articulate a satisfactory explanation for its action and rely on those factors that Congress intended it to consider.

113.   HERA specifies that, in its role as conservator, FHFA must act to (1) "put [each Company] in a sound and solvent condition," and (2) "conserve the assets and property of the [Company]." 12 U.S.C. § 4617(b)(2)(D).   For any action it takes, FHFA must satisfactorily

explain how that action advances the goals of conservatorships, and articulate a reasoned connection between the facts found and the choice made.

114.    FHFA made no record articulating (1) any evidentiary basis for the Net Worth Sweep Agreements' necessity in light of the congressionally mandated factors, (2) any alternatives it considered, or (3) any connection between the facts FHFA found and the decision it made.

115.    The Net Worth Sweep Agreements bore no relation to FHFA's obligations as conservator but were instead, at Treasury's insistence, designed to confiscate any and all of Fannie Mae's and Freddie Mac's positive returns or changes in net worth, for the exclusive benefit of Treasury, to the detriment of all other shareholders.

116.    As conservator, FHFA owes fiduciary duties to the Companies' shareholders.  In effecting the Net Worth Sweeps, FHFA fails to consider, disregards, and violates the fiduciary duties it owes to shareholders, including by engaging in self-dealing transactions that benefit the Government at the expense of Plaintiffs.

117.    FHFA's actions effecting the Net Worth Sweep Agreements are therefore arbitrary, capricious, and an abuse of discretion, and Plaintiffs are entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

**COUNT IV**
**Violation of the Administrative Procedure Act:**
**Arbitrary and Capricious Conduct**
**(Against Treasury and Secretary Lew)**

118.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

119.    The APA provides that "a reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).   Under this standard, an agency must articulate a

satisfactory explanation for its action and rely on those factors that Congress intended it to consider.

120.    To exercise its temporary authority to purchase shares of Fannie Mae and Freddie Mac, Treasury was required to consider "[t]he need to maintain the [Company's] status as a private shareholder-owned company." 12 U.S.C. §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v).

121.    Through the Net Worth Sweep Agreements, Treasury, in effect, converted its existing preferred shares, which carried a fixed 10% dividend, into shares carrying an unlimited, first-priority right to receive all of Fannie Mae's and Freddie Mac's net worth in perpetuity, without satisfying any part of the principal amount of the Government's preferred shares—all without making any of the required statutory findings, 12 U.S.C. §§ 1455(l)(1)(B), 1719(g)(1)(B), or considering the statutory factors set out in 12 U.S.C. §§ 1455(l)(1)(C), 1719(g)(1)(C).

122.    Treasury exercises actual control over FHFA, the Companies' conservator, with respect to the Net Worth Sweeps.   As controlling shareholder of each of the Companies, Treasury owes fiduciary duties to the other shareholders.   In effecting the Net Worth Sweeps, FHFA fails to consider, disregards, and violates the fiduciary duties it owes to shareholders, including by causing the Companies to engage in self-dealing transactions that benefit the Government to the detriment of Plaintiffs.

123.    Treasury's actions effecting the Net Worth Sweep Agreements and the Net Worth Sweeps are therefore arbitrary, capricious, and an abuse of discretion, and Plaintiffs are entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## COUNT V
### Direct Claim for Breach of Fiduciary Duty under Delaware and Virginia Law
### (Against FHFA and Director Watt as
### Conservator of Fannie Mae and Freddie Mac)

124.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

125.    By imposing a conservatorship on Fannie Mae and Freddie Mac, FHFA assumed control of the operations of the Companies.  As Director of FHFA, Director Watt has overall responsibility for the operation and management of FHFA, including its conservatorship over the Companies.

126.    By taking control of the operations of the Companies, FHFA and Director Watt assumed fiduciary duties, especially the duties of loyalty, good faith, and care, to Fannie Mae's and Freddie Mac's shareholders, including Plaintiffs.

127.    FHFA and Director Watt have breached their fiduciary duties to Plaintiffs, expressly depriving them of any and all of their economic rights as shareholders, as well as such fundamental rights as the right to inspect the records of the Companies.

128.    FHFA and Director Watt breached their fiduciary duties by using their control to agree to and implement the Net Worth Sweep Agreements, replacing the fixed dividend on Treasury's preferred stock with a perpetual, unlimited requirement that the Companies pay their entire earnings to Treasury.  FHFA and Director Watt also breached their fiduciary duties by directing the Companies' boards of directors to declare each quarterly Net Worth Sweep.

129.    As an agency of the United States, FHFA is interested in, and benefits from, the Net Worth Sweeps, which confer an exclusive benefit upon the Government by expropriating for itself the entirety of Fannie Mae's and Freddie Mac's net worth, and thereby stripping away from Plaintiffs' shares their economic value for the exclusive benefit of Treasury and the Government.

130.    FHFA and Director Watt have a manifest conflict of interest with respect to the Net Worth Sweep Agreements and Net Worth Sweeps, are not independent of Treasury as the exclusive beneficiary of the Net Worth Sweeps, and breached and continue to breach their fiduciary duties in approving and continuing to effectuate the Net Worth Sweeps.

131.    Once FHFA assumed control of the operations of each Company, the boards of directors that effectuated the Net Worth Sweeps were not independent of FHFA and Treasury and lacked a disinterested and independent majority.

132.    The Net Worth Sweep Agreements and the practice of paying quarterly cash dividends to Treasury, which effectively eliminate the economic value of and rights associated with Plaintiffs' common stock, are neither entirely nor intrinsically fair, and to the extent relevant, do not represent an appropriate exercise of business judgment.

133.    The Net Worth Sweep Agreements and the Net Worth Sweeps have unlawfully stripped valuable economic rights away from Plaintiffs and grant such rights instead to Treasury, and continue to do so, and are unfair to Plaintiffs.

134.    The Net Worth Sweep Agreements and the practice of paying quarterly cash dividends to Treasury are done with the intent to wind down and ultimately liquidate Fannie Mae and Freddie Mac, with all profits transferring to Treasury.

135.    By agreeing to, implementing, and carrying out the Net Worth Sweep Agreements and the quarterly cash dividends to Treasury, by operating Fannie Mae and Freddie Mac for the exclusive benefit of the Government rather than all of the Companies' shareholders, and by enabling Treasury to siphon all value out of the Companies, FHFA and Director Watt breached their fiduciary duties to Plaintiffs.

136.    As a direct result of the breaches of fiduciary duties by FHFA and Director Watt, Plaintiffs suffered harm through the expropriation of the total value of their equity.

137.    Plaintiffs bring a direct claim against the FHFA and Director Watt for the unique harm to them in the form of the economic value that was extracted and unlawfully transferred to Treasury.

138.    The benefits of these breaches of fiduciary duties inured to the Government, of which FHFA is an agency.

139.    The Government, as both the Companies' purported conservator (FHFA) and as the controlling stockholder of the Companies (Treasury), had a manifest conflict of interest in devising and entering into the Net Worth Sweep Agreements, which benefits the Government exclusively while correspondingly harming the Companies' other shareholders.

140.    As a direct and proximate result of the creation of illegal and improper securities, Plaintiffs have been wrongfully deprived of the economic value of their common shares, and bring a direct claim against the fiduciaries—including FHFA—for that unique harm.

**<u>COUNT VI</u>**
**Direct Claim for Breach of Fiduciary Duty under Delaware and Virginia Law**
**(Against Treasury as Controlling Shareholder of Fannie Mae and Freddie Mac)**

141.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

142.    Treasury (as the Companies' controlling shareholder) exercises control over Fannie Mae and Freddie Mac.  Treasury planned, directed, and caused the enactment of the Net Worth Sweep Agreements, together with FHFA and Director Watt, and requires the Net Worth Sweeps.

143.    Treasury (as the Companies' controlling shareholder) owed fiduciary duties, especially the duties of loyalty, good faith, and care, to Fannie Mae's and Freddie Mac's shareholders, including Plaintiffs.

144.     Treasury breached those fiduciary duties to Plaintiffs by using its control to plan, direct, agree to, and implement the Net Worth Sweep Agreements and by requiring each Net Worth Sweep.  The Net Worth Sweep Agreements replaced the fixed dividend on Treasury's preferred stock with a perpetual, unlimited requirement that the Companies pay their entire earnings and positive changes in net worth exclusively to Treasury, depriving Plaintiffs of any and all of their economic rights as shareholders.  The Net Worth Sweep Agreements and the Net Worth Sweeps gave Treasury's class of preferred shares the rights to the residual value of the Companies, while simultaneously preventing the existing common shares from having any of the same rights and benefits.

145.     As an agency of the Government and recipient of the cash dividends, Treasury is interested in, and directly benefits from, the Net Worth Sweeps, which confer an exclusive benefit upon the Government by expropriating for itself the entirety of Fannie Mae's and Freddie Mac's net worth, and thereby stripping away from Plaintiffs' shares their economic value for the exclusive benefit of Treasury and the Government.

146.     Treasury has a manifest conflict of interest with respect to the Net Worth Sweep Agreements and Net Worth Sweeps and breached and continues to breach its fiduciary duties to Plaintiffs in devising, agreeing to, and continuing to effectuate the Net Worth Sweep Agreements and the Net Worth Sweeps.

147.     Once FHFA assumed control of the operations of Fannie Mae and Freddie Mac, the boards of directors that effectuated the Net Worth Sweeps were not independent of FHFA and Treasury and lacked a disinterested and independent majority.

148.     The Net Worth Sweep Agreements and the practice of paying cash dividends to Treasury, which effectively eliminate the economic value of and rights associated with Plaintiffs'

common stock, are neither entirely nor intrinsically fair, and to the extent relevant, do not represent an appropriate exercise of business judgment.

149.   The Net Worth Sweep Agreements and the Net Worth Sweeps have unlawfully stripped valuable economic rights away from Plaintiffs and grant such rights instead to Treasury, and continue to do so, and are unfair to Plaintiffs.

150.   The Net Worth Sweep Agreements and the practice of paying cash dividends is done with the intent to wind down and ultimately liquidate Fannie Mae and Freddie Mac, while all profits are being diverted to Treasury.

151.   By devising, agreeing to, and implementing the Net Worth Sweep Agreements and Net Worth Sweeps, by operating Fannie Mae and Freddie Mac for the exclusive benefit of the Government rather than all of the Companies' shareholders, and by siphoning all value out of the Companies, Treasury breached its fiduciary duties to Plaintiffs.

152.   As a direct result of the breaches of fiduciary duties by Treasury, Plaintiffs suffered harm through the expropriation of equity, as well as the dividends that they would have received had Treasury not implemented the Net Worth Sweep Agreements or paid cash dividends.

153.   Plaintiffs bring a direct claim against Treasury for the unique harm to them in the form of the economic value that was extracted and unlawfully transferred to Treasury.

154.   The benefits of these breaches of fiduciary duties inured to Treasury.

155.   The Government, as both the Companies' purported conservator (FHFA) and as the controlling stockholder of the Companies (Treasury), had a manifest conflict of interest in devising and entering into the Net Worth Sweep Agreements, which benefits the Government exclusively while correspondingly harming the Companies' other shareholders.

156.    As a direct and proximate result of the creation of illegal and improper securities, Plaintiffs have been wrongfully deprived of the economic value of their common shares, and bring a direct claim against the fiduciaries—including Treasury—for that unique harm.

**COUNT VII**
**Direct Claim for Breach of Fiduciary Duty under Delaware and Virginia Law:**
**Conversion of the Government's Senior Preferred Stock to Common Stock;**
**Creation of Improper Securities**
**(Against Treasury, FHFA, and Director Watt)**

157.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

158.    Preferred stock, by its nature, provides for dividends payable *in preference to* dividends payable on common stock.  Common shareholders are entitled to the residual value, if any, of the company.

159.    The Net Worth Sweep Agreements arrogate to Treasury, as the holder of the senior preferred stock, all the residual economic value of the Companies.  The dividends and liquidating distributions to which Treasury is purportedly entitled are defined such that all value of the Companies in excess of what is owed to creditors must be paid to Treasury.  As a direct result, Plaintiffs, as holders of common shares, have no economic residual rights, because under the terms of Treasury's senior preferred stock as established by the Net Worth Sweep Agreements, no value can ever accrue to Plaintiffs, no matter how much the Companies' value may increase.

160.    Through the Net Worth Sweep Agreements and ensuing Net Worth Sweeps, Defendants, in effect, converted Treasury's special class of preferred shares of the Companies into a new super-senior form of preferred shares, for which the principal is never satisfied despite Treasury's receiving all residual value of the Companies, a right that is reserved to common shares.  Simultaneously, the Government prevented Plaintiffs, who are common shareholders,

from participating in their rightful economic share of the Companies' distributions, thereby harming Plaintiffs.

161.    In the alternative, through the Net Worth Sweep Agreements and the Net Worth Sweeps, Defendants created a class of stock that gave Treasury a dividend that constitutes the entire earnings of the Companies, in perpetuity.  This effectively nullifies the economic value of all other shareholders' stock, including Plaintiffs', in violation of fundamental corporate principles and of applicable state corporation law.

162.    The Government, as both the Companies' purported conservator (FHFA) and their controlling stockholder (Treasury), had a manifest conflict of interest in devising and entering into the Net Worth Sweep Agreements and directing the Net Worth Sweeps, which benefit the Government exclusively while correspondingly harming Plaintiffs.

163.    As a direct and proximate result of the conversion of Treasury's senior preferred stock into common stock while foreclosing Plaintiffs from participating pari passu in any dividends or distributions on Treasury's stock, or, in the alternative, of the creation of illegal and improper securities, Defendants have wrongfully deprived Plaintiffs of the economic value of their common shares.  Plaintiffs bring a direct claim against the fiduciaries—Treasury, FHFA, and Director Watt—responsible for that harm.

<u>COUNT VIII</u>
**Claim under Delaware and Virginia Law for**
**Improper Denial of Demand to Permit Inspection of Books and Records**
**(Against FHFA and Director Watt; Claim Brought by Pershing Square Only)**

164.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

165.    As a stockholder of the Companies, Pershing Square has a right to inspect the Companies' books and records and to make copies therefrom, pursuant to state corporation law.

166.     Pershing Square's demands to inspect and make copies of the stockholder lists of the Companies complied with the form and manner requirements of that law.

167.     Pershing Square's demands' stated purposes reasonably related to its interest as a stockholder of the Companies.

168.     FHFA, purporting to act as conservator of the Companies, has refused to permit Pershing Square to inspect and copy the requested stockholder lists.

169.     Pershing Square has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray for an order and judgment:

a.     Declaring that FHFA as conservator had and has a duty under HERA to put the Companies in a sound and solvent condition, carry on their business, and preserve and conserve their assets and property;

b.     Declaring that the Net Worth Sweep Agreements and the Net Worth Sweeps pursuant to them are not in accordance with HERA within the meaning of 5 U.S.C. § 706(2)(C) and (D), and that Defendants acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by executing the Net Worth Sweep Agreements and by directing the Net Worth Sweeps;

c.     Vacating the Net Worth Sweep Agreements and rescinding the Net Worth Sweeps;

d.     Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep Agreements, including the Net Worth Sweeps;

e.     Enjoining Treasury and its officers, employees, and agents, from exercising control over FHFA in its capacity as conservator of Fannie Mae and Freddie

Mac, and declaring null and void any provisions of the Stock Purchase Agreements purporting to authorize Treasury to do so;

      f.      Declaring that Plaintiffs have the right to inspect the Companies' stockholder lists;

      g.      Ordering Defendants to make available to Plaintiffs the Companies' stockholder lists;

      h.      Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

      i.      Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  August 15, 2014

/s/      James E. Gauch
Thomas F. Cullen (D.C. Bar No. 224733)
Michael A. Carvin (D.C. Bar No. 366784)
James E. Gauch (D.C. Bar No. 447839)
Paul V. Lettow (D.C. Bar No. 502440)*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
T: (202) 879-3939
F: (202) 626-1700
jegauch@jonesday.com

*Counsel for Plaintiffs*

* Application for admission pending